**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

REBECCA JONES,                                    *

     **Plaintiff,**                                *

v.                                                *          **Case No.: PWG-14-3869**

COLLEGE OF SOUTHERN MARYLAND, *

     **Defendant.**                              *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## MEMORANDUM OPINION

While she was working for the College of Southern Maryland (the "College") as an assistant English professor, Rebecca Jones requested FMLA leave in the form of a modified and reduced course load, first because of her infant son's separation anxiety, and then simply based on his birth. The College agreed to a modified and reduced schedule, but not the one Jones sought, and less than two months after her second FMLA request, it notified her that it would not be renewing her contract for the next academic year. Jones filed suit, claiming interference with her FMLA rights and retaliation for her attempts to exercise them. The College has moved for summary judgment on both claims. ECF No. 22.[1] Because the College did not deny Jones any benefits to which she was entitled under the FMLA, I will grant its motion as to her interference claim. But, because Jones has established a *prima facie* case of retaliation and identified evidence from which a reasonable jury could find that the College's legitimate non-retaliatory reason for not renewing her contract was pretext for its retaliatory motive, I will deny the motion as to her retaliation claim.

---

[1] The parties fully briefed the motion. ECF Nos. 22-1, 25, 26. A hearing is not necessary. *See* Loc. R. 105.6.

## **Background**[2]

The College hired Rebecca Jones as an assistant professor for the 2011–2012 academic year and renewed her contract for two additional years.  Jones Dep. 48–49, Jt. Ex. 48.  Her full course load was five courses each semester, some of which were on-line courses.  *Id.* at 68, Jt. Ex. 53.  Jones gave birth to a son, K.P., on June 17, 2013.  *Id.* at 80, Jt. Ex. 56.  Prior to his birth, she asked to modify her teaching schedule so that she only had to be on campus on Fridays for Fall semester 2013, and the College accommodated her request.  *Id.* at 73, Jt. Ex. 54.

On or about November 22, 2013, just before Thanksgiving break, Jones "requested a schedule" in which she would work a reduced load of four courses for Spring semester 2014.  *Id.* at 101–02, Jt. Ex. 61–62.  When she was told she "couldn't teach certain classes" (apparently on-line courses and those that fit into the Tuesday/Thursday schedule she sought, *see id.* at 106, Jt. Ex. 64), she "went to HR so that [she] could find out what [she] needed to do to fill out and submit FMLA paperwork" to obtain approval for a reduced load.  *Id.* at 101–02, Jt. Ex. 61–62. She was told she needed to speak with Jennifer Rupp, Lead Director of Compensation and Benefits at the College, who was not available until December 6, 2013, after Thanksgiving break.  *Id.*; *see* Rupp Dep. 6, Jt. Ex. 3.

On December 6, Jones "explained to [Rupp] what [her] circumstances were" and "that [she] could not work a full load in the Spring."  Jones Dep. 102, Jt. Ex. 62.  Specifically, she told Rupp that she "believed that [her] son was experiencing separation anxiety" and that she "needed to take leave because . . . of [her] son" and the "health condition" he had.  *Id.* at 102–03, 108, Jt.

---

[2] In reviewing the evidence related to a motion for summary judgment, the Court considers undisputed facts, as well as the disputed facts viewed in the light most favorable to the non-moving party.  *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009); *George & Co., LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 391–92 (4th Cir. 2009).

Ex. 62, 63.  Rupp recalled that Jones "indicated that her child had a medical condition . . . . separation anxiety."  Rupp Dep. 12, Jt. Ex. 4.

Jones did not ask "to take the Spring semester off."  Jones Dep. 104, Jt. Ex. 62.  Rather, she "wanted to have a modified schedule" that "would accommodate [her] needs" with regard to her "son's separation anxiety."  *Id.* at 104–05, Jt. Ex. 62.  Rupp informed Jones that, "based on her request that indicated her child had a medical condition, she needed to return [a] medical certification form from [her son's] medical provider."  Rupp Dep. 14, Jt. Ex. 5. Jones's son's pediatrician did not fill out the form.  Jones Dep. 108, Jt. Ex. 64.

On about January 15, 2014, Jones revised her request for FMLA leave, telling Rupp that she "want[ed] to take leave because of the birth of [her] son."  *Id.* at 123–25, Jt. Ex. 67; *see* Rupp Dep. 16, Jt. Ex. 5.  Again, she did not request any length of time off; instead, she "requested two on-line classes and two face-to-face classes so [she] would only be short load by one course."  Jones Dep. 125, Jt. Ex. 67. What she wanted to do was "use [her] sick leave . . . [t]o not teach a class."  *Id.* at 129, Jt. Ex. 68. Her requested accommodation was denied "because of complaints with the on-line classes."  *Id.* at 126, Jt. Ex. 68.  She was allowed, however, to teach fewer classes for "a reduction in pay."  *Id.* at 127, Jt. Ex. 68.  But, she "was blocked from what would have been an optimal schedule" in her opinion, in which she would "not have had to use [her] leave at all."  *Id.* at 128–29, Jt. Ex. 68.

In February 2014, Jones met with Barbara Scotland, who at the time was the Chair of the Language and Literature Department at the College.  *Id.* at 138–39, Jt. Ex. 71; Scotland Dep. 6, Jt. Ex. 136.  Scotland shared with Jones withdrawals and negative feedback that students had provided with regard to Jones's on-line courses.  Jones Dep. 138–39, Jt. Ex. 71.  Jones testified: "[T]he students say the same thing, that I don't respond, I don't explain. The work is too hard,

and I don't give enough feedback." *Id.* at 156, Jt. Ex. 75. According to Jones, "they were not telling the truth," but she did not have the opportunity to explain that to Scotland. *Id.* Scotland "recommended that Ms. Jones go on administrative leave" for Spring semester 2014. Scotland Dep. 70, Jt. Ex. 152. On February 27, 2014, the College notified Jones that her contract would not be renewed after the end of the 2013–2014 academic year. Jones Dep. 131–33, Jt. Ex. 69. Jones testified that she "was terminated right after using" FMLA leave, "while she was on it." *Id.* at 130, Jt. Ex. 69. Scotland testified that she did not know that Jones was on FMLA leave when the termination letter was sent; she did not learn that Jones was on FMLA leave at that time until her deposition. Scotland Dep. 71, Jt. Ex. 152.

## **Standard of Review**

Summary judgment is proper when the moving party demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c)(1)(A); *see Baldwin v. City of Greensboro*, 714 F.3d 828, 833 (4th Cir. 2013). If the party seeking summary judgment demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to identify evidence that shows that a genuine dispute exists as to material facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 & n.10 (1986). The existence of only a "scintilla of evidence" is not enough to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). Instead, the evidentiary materials submitted must show facts from which the finder of fact reasonably could find for the party opposing summary judgment. *Id.*

**Unlawful Interference with FMLA Rights (Count I)**

The FMLA was enacted, in part, "to entitle employees to take reasonable leave for medical reasons." 29 U.S.C. § 2601(b)(1)–(2). Pursuant to the FMLA, "an eligible employee is entitled to a total of twelve workweeks of leave during any twelve-month period and, upon return to work, restoration to the position held when the leave commenced or to an equivalent position." *Rodriguez v. Smithfield Packing Co.*, 545 F. Supp. 2d 508, 515 (D. Md. 2008) (citing 29 U.S.C. § 2614(a)(1)(A)–(B)).

> To establish unlawful interference with an entitlement to FMLA benefits, an employee must prove that: (1) she was an eligible employee; (2) her employer was covered by the statute; (3) she was entitled to leave under the FMLA; (4) she gave her employer adequate notice of her intention to take leave; and (5) the employer denied her FMLA benefits to which she was entitled.

*Id.* at 516 (citations omitted). The employee also must prove "that the violation prejudiced her in some way." *Anderson v. Discovery Commc'ns, Inc.*, 517 F. App'x 190, 197 (4th Cir. 2013) (citing *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002); 29 U.S.C. § 2617(a)(1)); *see also Rodriguez*, 545 F. Supp. 2d at 523 (stating that no relief is available if the "violation caused no harm").

Jones claims that "Defendant unlawfully interfered with Plaintiff Jones' lawful right to unpaid leave pursuant to the FMLA when Defendant originally denied Plaintiff's request for FMLA leave, and did not grant FMLA leave until over a month later when Plaintiff researched the law on her own to determine that she was eligible." Am. Compl. ¶ 42, ECF No. 14. The College challenges Jones' ability to prove the fifth element, insisting that Plaintiff was not denied "an FMLA benefit to which any employee is entitled." Def.'s Mem. 17. It argues that Jones did not submit "the required medical certification to support her [December 6, 2013] request for FMLA leave" to care for her son because of his health condition, and therefore she

was not entitled to the FMLA leave she initially sought. *Id.* at 18. The College also contends that, when Jones modified her request to seek a reduced workload as FMLA leave for the birth of a child, it "was not obligated to provide Jones FMLA leave to work a reduced schedule for bonding time with a newborn." *Id.* at 19.

It is undisputed that Jones originally sought leave to work "a modified schedule" that was less than "a full load in the Spring" because her "son was experiencing separation anxiety." Jones Dep. 102–05, 108, Jt. Ex. 62, 63. It also is undisputed that at that time, she did not request FMLA leave for the *birth* of her child. *See id.* FMLA leave certainly is available to care for an immediate family member with a serious health condition. *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 192 (4th Cir. 2010) (citing 29 U.S.C. § 2612(a)(1)(C)), *aff'd sub nom. Coleman v. Court of Appeals of Md.*, 132 S. Ct. 1327 (2012). But to be eligible for such leave, unlike for leave for the birth of a child, an employee may be required to provide certification from the family member's health care provider. *See* 29 U.S.C. § 2613(a). The College imposes such a requirement. *See* Manual, Jt. Ex. 15–16 ("Employees are required to provide medical documentation on the FMLA Medical Certification form to support a leave request to care for an immediate family member with a serious health condition."). It is undisputed that Jones did not provide any certification from her son's pediatrician. *See* Jones Dep. 108, Jt. Ex. 63. Therefore, she was not entitled to take leave to care for him because of his medical condition, *see* 29 U.S.C. § 2613(a); Manual, Jt. Ex. 15–16, and the College did not interfere with her FMLA rights by denying the leave she originally requested. *See Rodriguez*, 545 F. Supp. 2d at 516.

The parties also agree that Jones later, on about January 15, 2014, asked "to take leave because of the birth of [her] son." Jones Dep. 123–25, Jt. Ex. 67; *see* Rupp Dep. 16, Jt. Ex. 5. Up to twelve weeks of FMLA leave are available for the birth of a child. *See Coleman*, 626 F.3d

at 192 (citing 29 U.S.C. § 2612(a)(1)(A)).   Yet, it is undisputed that Jones did not ask to take any time *off*.  *See* Jones Dep. 125, Jt. Ex. 67.   What Jones wanted was a reduced schedule that included a total of four courses and only "two face-to-face classes" so that she could minimize her time away from home while *not using any unpaid FMLA leave time*.  *See id.* at 125, 130, Jt. Ex. 67, 69.   She testified that the College interfered with her rights to benefits by not "mak[ing] the accommodations" she requested and consequently preventing her from being "able to use [her] sick leave . . . [t]o not teach a class . . . . so that [she] would not have to use FMLA."  *Id.* at 129, 130, Jt. Ex. 68, 69.   Thus, what Jones sought was not FMLA leave but rather a schedule that enabled her to be home as much as she needed to care for her son without taking FMLA leave.  The College could not interfere with Jones's FMLA leave when she actually did not want to take FMLA leave.

Further, an employer has the discretion, but no obligation, to agree to a reduced workload in lieu of a leave of absence.  *See* 29 U.S.C. § 2612(b)(1) ("Leave [for the birth of a child] shall not be taken by an employee intermittently or on a reduced leave schedule unless the employee and then employer of the employee agree otherwise.").   Indeed, Jones acknowledged that "the employer had the *discretion* to give a flex schedule."   Jones Dep. 130, Jt. Ex. 69 (emphasis added); *see also* Pl.'s Opp'n 11 (noting that "getting a particular work schedule is not protected by the FMLA").   Therefore, the College did not interfere with Jones's FMLA rights by not agreeing to the reduced workload that Jones specifically requested.  *See Rodriguez*, 545 F. Supp. 2d at 516.

Jones's argument that the College interfered with her FMLA rights by failing to inform her on December 6, 2013 of her right to take FMLA leave for the birth of a child, which allegedly caused her to incur child care and medical expenses while she was under the mistaken

impression that she only could take FMLA leave if he had a medical condition, Pl.'s Opp'n 12–14, obfuscates the issue.  Regardless of when she learned of her FMLA rights, she never sought benefits to which she was entitled, as discussed above.  The College simply cannot be liable for "den[ying] her FMLA benefits to which she was entitled" when she was *not* entitled to the benefits she sought.  *See Rodriguez*, 545 F. Supp. 2d at 516.  In any event, Jones originally sought FMLA leave for Spring semester 2014, and, despite her misunderstanding, she still requested FMLA leave based on the birth of her child before Spring semester began. Jones Dep. 101–02, 122–24, Jt. Ex. 61–62, 67.  She fails to identify any evidence to support her assertion that her misunderstanding of her FMLA rights caused any harm, and therefore it cannot be the basis for liability.  *See Anderson*, 517 F. App'x at 197; *Rodriguez*, 545 F. Supp. 2d at 523.

Moreover, the evidence establishes that Jones signed an Administrative Manual Acknowledgment form at the beginning of her employment with the College, on August 16, 2011, stating that she "underst[oo]d" that the Manual was "posted, and updated, on the college's internet site at http://www.csmd.edu/faculty/AdminManual/," and that she, as an employee, was "expected [to] become familiar with the contents of the manual and [to] comply with the policies and procedures."[3]  Acknowledgment, Jt. Ex. 25.  The Manual included ten pages in a section titled "Leave," which includes a subsection on FMLA leave.  Manual, Jt. Ex. 15–24.  It provided that employees could take FMLA leave "to care for an immediate family member with a serious health condition" or "for the birth of a child," and that "[e]mployees [we]re required to provide medical documentation on the FMLA Medical Certification form to support a leave request to care for an immediate family member with a serious health condition."  *Id.*, Jt. Ex. 15–16.

---

[3] This clear language belies Plaintiff's disingenuous argument that this "document only requires that Plaintiff acknowledge that she read and understood the contents of the Administrative Manual Acknowledgment, not the actual contents of the administrative manual or the FMLA policy," Pl.'s Opp'n 3.

Additionally, the College had "FMLA posters" on each of its campuses.  Rupp Dep. 17, Jt. Ex. 5. And, Jones acknowledged that the paperwork Rupp gave her on December 6, 2013 included a checkbox for an employee to request FMLA leave for the birth of a child.  Jones Dep. 109, Jt. Ex. 64.  Thus, the College informed Jones of her FMLA rights well before December 6, 2013.

In sum, the College has shown that there is no genuine dispute that Jones was not entitled to the particular FMLA benefits she sought in December 2013 or January 2014, and Plaintiff has not identified evidence to the contrary or evidence that the College otherwise is liable for interfering with her FMLA rights.  Summary judgment in the College's favor on this count is appropriate. *See Rodriguez*, 545 F. Supp. 2d at 516; *see also Matsushita*, 475 U.S. at 585–87 & n.10.

## Retaliation for Exercising FMLA Rights (Count II)[4]

Jones claims that, because she requested and took FMLA leave, the College "retaliated against her by terminating Plaintiff's employment after three years of faithful work, just as she was being considered for promotion and tenure at the beginning of the 2014-2015 academic year."  Am. Compl. ¶ 50.  She also claims that, in retaliation, the College "reduced [her] bi-weekly paycheck after she came back from leave by $300-$500 each check, and after [she] requested leave, her assignment at the Waldorf campus was terminated and she was reassigned classes that were on the La Plata campus, farther away from her home."  *Id.* ¶ 51.

The FMLA "protect[s] employees from discrimination or retaliation for exercising their substantive rights under the FMLA." *Vannoy v. Fed. Reserve Bank of Richmond*, 827 F.3d 296, 298 (4th Cir. 2016) (quoting *Dotson v. Pfizer, Inc.*, 558 F.3d 284, 294 (4th Cir. 2009)).

---

[4] Although Count II is titled "Discrimination Retaliation For Taking FMLA Leave, 29 U.S.C. § 2615(A)(2)," the Amended Complaint, as well as Plaintiff's Opposition, focuses on retaliation without discussing discrimination.  Therefore, I will address only retaliation in this discussion.

> FMLA retaliation claims may rest on circumstantial evidence evaluated under the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973). An FMLA plaintiff claiming retaliation "must first make a prima facie showing that he engaged in protected activity, that the employer took adverse action against him, and that the adverse action was causally connected to the plaintiff's protected activity." *Yashenko v. Harrah's NC Casino Co., LLC*, 446 F.3d 541, 551 (4th Cir. 2006). Once the plaintiff proffers evidence establishing his prima facie case, and the employer offers a non-retaliatory reason of the adverse action, the plaintiff "bears the burden of establishing that the employer's proffered explanation is pretext for FMLA retaliation." *Id.*

*Id.*

## *Prima Facie* Case

The College contends that Jones cannot establish a causal connection because she "can point to only a more than three month gap between the date she first exercised her FMLA rights on November 22, 2013, and the date of her non-renewal letter on February 27, 2014, as evidence of causation." Def.'s Mem. 21. Indeed, "the Supreme Court and the Fourth Circuit have repeatedly emphasized [that] temporal proximity must be 'very close' to show a causal connection," and "[o]n this reasoning, the Fourth Circuit has rejected gaps of as little as two months." *Johnson v. United Parcel Serv., Inc.*, No. RDB-14-4003, 2016 WL 4240072, at *6–7 (D. Md. Aug. 11, 2016); *see also Clark Cnty.Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001); *Horne v. Reznick Fedder & Silverman*, 154 F. App'x 361, 364 (4th Cir. 2005) (no causation with two-month gap). Yet, there is sufficient temporal proximity between Jones's later request for FMLA leave on January 15, 2014 and her termination of February 27, 2014 to establish a causal connection. *See Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 247, 253 & n.16 (4th Cir. 2015) (noting that it would be "plainly contrary to law" to "only look to Foster's initial complaint of harassment and not her subsequent complaints of retaliation" and concluding that "Foster's evidence of temporal proximity also tends to show causation*: according to her uncontradicted*

testimony, she complained to Billie about perceived retaliation on September 21, 2007, and again on September 28, 2007, just a month before she was terminated" (emphasis removed)); *Rhodes v. Comcast Cable Commc'ns Mgmt., LLC*, No. GLR-14-1824, 2016 WL 4376653, at *7 (D. Md. Aug. 17, 2016) ("The temporal proximity between Rhodes's *last* undisputed complaints of sexual harassment on July 6, 2012 and her termination on August 1, 2012, gives rise to an inference of causation." (emphasis added)).

<u>Legitimate, Non-retaliatory Reason</u>

As for a legitimate non-retaliatory reason for not renewing Jones's contract, the College insists that "Jones was failing to meet [its] legitimate performance expectations," Def.'s Mem. 23, noting that, in addition to student complaints, "there were also allegations of racial bias, a concerning classroom observation, high course withdrawal rates, negative student evaluations and problems with punctuality," *id.* at 24.  The evidence shows that, as far back as February 22, 2012, when the College considered for the first time whether to renew Jones's contract, there were concerns with her performance.  Scotland Memo. to Def.'s Vice Pres. Academic Affairs, Jt. Ex. 26.  Scotland recommended renewing the contract "with some recommendation for improvements," noting that evaluation of Jones's "teaching performance . . . reflected a good performance reflective of expectations for a new faculty member."  *Id.*  Scotland stated that "[a]lthough Rebecca . . . demonstrated expertise in her content areas of teaching, some students in her courses have expressed concern about her demeanor in the classroom," reporting that "they were intimidated" and "that she was 'rude,' 'inflexible,' tended to 'go off on tangents,' and 'forc[ed] her political agendas' on students."  *Id.*, Jt. Ex. 27.

According to Scotland, Jones "conceded she comes across as 'tough' and 'intimidating,'" and "agreed to be more conscientious as to how she came across to students."  *Id.*  Jones testified

that she "never conceded to that" or "agree[d] to that either," and she did not "have a personal agenda." Jones Dep. 51, 53, Jt. Ex. 49. As Jones recalled, "the discussion was around student work ethic and what their complaints were and the fact that they were used to getting As and they were not getting As." *Id.* at 51–52, Jt. Ex. 49. She said that the discussion also was about her "being unapproachable and intimidating," which Jones said was "a perception," and Jones "was not clear what [Scotland] wanted [her] to do as far as the perception is concerned." *Id.* at 52, Jt. Ex. 49. Additionally, with regard to the allegations that she was rude and went off on tangents, Scotland reported that Jones "felt the students misunderstood her attempts to engage them more fully in class discussions and critical thinking." Scotland Memo. to Def.'s Vice Pres. Academic Affairs, Jt. Ex. 27. Jones did not "recall that being a part of [her] discussion" with Scotland. Jones Dep. 52, Jt. Ex. 49.

According to Jones, after her discussion with Scotland, Scotland "put [her] out of the classroom and she let [the students] have a free-for-all, just the students that [she] was having problems with, just take over and say a lot of negative things," while Jones "had no opportunity to respond to anything." *Id.* at 55, Jt. Ex. 50. Scotland's meeting with the students "resulted in [Jones] not teaching that class for the semester." *Id.* at 56, Jt. Ex. 50. As Scotland recalled, she and Jones "agreed [Jones] should give up one of her course sections in which the climate of the classroom had become too negative to enable her to teach effectively," where Jones "found herself frustrated by students who were not completing the course work." Scotland Memo. to Def.'s Vice Pres. Academic Affairs, Jt. Ex. 27. Scotland stated that even those "students in the class [who] felt that Rebecca was justified in being 'tough[]' . . . admitted they had a hard time coming to class because of the tension between Rebecca and some students in the class." *Id.* In

Scotland's opinion, Jones had "great potential," but Scotland "would expect her to find a better balance of mutual respect between herself and her students." *Id.*, Jt. Ex. 28.

Indeed, some concerns with Jones's classroom demeanor surfaced in her first peer classroom observation, on November 7, 2011. Classroom Observation Form, Jt. Ex. 29.  In the generally positive evaluation, in which the evaluator stated that Jones "shine[d]" with regard to her familiarity with the course materials, he also noted his initial "concern[] that the instructor's style may threaten the transmission of her substance."  *Id.*, Jt. Ex. 29–30.  He reported that "as the class progressed [he] became less concerned" and "was assured that style complements substance for this able instructor."  *Id.*  In his view, "[d]espite the instructor saying . . . 'Don't get defensive. Don't get touchy,' most students [were] comfortable with the instructor." *Id.*, Jt. Ex. 29.

In Spring 2013, Jones received a complaint from a student who "decided to withdraw" from one of Jones's on-line courses because the student "found that she d[id] not commu[n]icate well with students" and her "class and grading system [was] hard to understand."  Response Card, Jt. Ex. 32.  Jones informed Scotland that "this student did not email [her] for clarification, ask [her] questions, nor did she call to speak to [Jones] directly, nor make an appointment to see [her] in person to get clarification."  Jones email to Scotland, Jt. Ex. 31.  According to Jones, she provided ample instructions on-line, prompt feedback on assignments, and prompt answers to student questions, but "students fail[ed] to read the syllabus, and go to the corresponding links . . . to access the proper documents before doing their assignments."  *Id.*  In June 2013, Jones received another complaint from a student in an on-line course who was "very frustrated with the set-up of the course" and "felt it was not clear how to submit certain assignments."  Scotland email to Jones, Jt. Ex. 33.  Jones responded that "all of the requirements [were] directly stated

either on the syllabus, through an 'Announcement', or posted under a thread that I create for each week to address questions," and she "ha[s] referred students back to the syllabus because their questions reflect[ed] that they obviously didn't read it." Jones email to Scotland, Jt. Ex. 33.

There were additional complaints in Fall 2013. Jones Dep. 89–90, Jt. Ex. 58–59.  One student said that Jones arrived late, went "off topic very easily," and did "not explain assignments clearly" and "when you ask her to explain it again she will criticize the entire class." Student Evaluation, Jt. Ex. 116.  Another student said that Jones's "class . . . made [the student] not want to take another online class, at least not with this instructor," whom the student described as "very unclear as to what her expectations are for assignment."  Student Evaluation, Jt. Ex. 120.  The student said that Jones "was very ineffective at communicating with students." *Id.*  A third student said that the "class can be very confusing" and Jones "should have more patience for taking time to thoroughly explain the assignments before they are due."  Student Evaluation, Jt. Ex. 125.

One student complained of "racial bias," Makeba Clay email to Jones, Jt. Ex. 109, and Jones discussed it with Makeba Clay, the Head of the Equity and Diversity Department,  in person but decided not to submit a written response, Jones email to Clay, Jt. Ex. 110.  The student informed Clay that Jones then "came to class and asked the students who had filed a complaint against her" and "asked several times if anyone had a problem with the theme of the course as well as the delivery of instruction"; thereafter, the student did not attend the class "because she felt 'afraid' and 'stressed out' by what she perceived as retaliation." Clay email to Scotland, Jt. Ex. 111.

By the time the College was considering whether to renew Jones's contract, it was "having a very difficult time filling Rebecca's classes," which "were being cut for low

enrollment."  Scotland Dep. 66, Jt. Ex. 151.  Further, "when [the College] tried to rework her schedule," Jones "wanted to only work a certain number of days a week.  Limiting her time on campus to two days a week, if she could," and she gave "very specific times on those days that she would work, that [the College] could not accommodate, because the courses were already assigned to other faculty."  *Id.* at 66–68, Jt. Ex. 151.  Consequently, "it was difficult to find courses that would make it possibl[e] to make load," that is, have Jones teach a full course load. *Id.* at 67, Jt. Ex. 151.  Additionally, more "[s]tudents were withdrawing from her classes, or . . . completing her class with a F," than other professors' courses.  *Id*. at 73, Jt. Ex. 152.

But not all of the feedback was negative.  Another professor evaluated Jones more recently, in November 2013, and "found her class to be very enjoyable" and "was impressed with the responsiveness of her students during the class discussion."  Classroom Observation notes, Jt. Ex. 129.  He said that "[i]t was obvious that Rebecca had built a comfortable learning environment for her students."  *Id.*  He noted that when one of the four students present "was noticeably quiet," Jones asked if she had "'something to add'" and if she was following the discussion.  *Id.*  He observed that "there was confusion" because the students were reading from a different copy of the play they were discussing than Jones had, and that use of audio-visual equipment could have alleviated the issue.  *Id.*, Jt. Ex. 130.  A reasonable jury could find that overall, however, the combination of the scheduling concerns, withdrawal rates, and ongoing student complaints, including one of racial bias, many of which raised the same concerns about Jones's classroom demeanor and her ability to explain assignments clearly, as well as the concerns expressed in the otherwise-favorable evaluations by professors, provided a legitimate non-retaliatory reason for the College not to renew Jones's contract.  Accordingly, it is necessary

to evaluate Jones's contention that the College's asserted "legitimate non-discriminatory" explanation for her termination was, in fact, a pretext.

Pretext

Jones insists that these reasons are pretext for the College's discriminatory animus. Pl.'s Opp'n 15. In her view, "her two peer reviews while employed at [the College] were of satisfactory nature, despite Defendant's desire to characterize them as 'concerning' or 'poor.'" *Id.* And, she contends that she testified that "Barbara Scotland's personal animus towards Ms. Jones contributed to Barbara Scotland making the recommendation that Ms. Jones not be renewed for the 2014 – 2015 school year." *Id.* Additionally, Jones argues that Scotland's credibility is questionable, given that Scotland testified that she did not know Jones was on FMLA leave when she recommended that the College not renew her contract, while an email from Scotland showed that, in fact, she was aware of Jones's FMLA leave. *Id.* at 15–16. The College asserts that "a plaintiff's own assertions of discrimination in and of themselves are insufficient to counter substantial evidence of legitimate nondiscriminatory reasons for an adverse employment action." Def.'s Reply 7–8 (quoting *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 459 (4th Cir. 1989)).

"[T]he *McDonnell Douglas* framework has long demanded proof at the pretext stage that retaliation was a but-for cause of a challenged adverse employment action." *Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 252 (4th Cir. 2015). Thus, to prevail, Jones "must establish 'both that the [employer's] reason was false and that [retaliation] was the real reason for the challenged conduct.'" *Id.* (quoting *Jiminez v. Mary Wash. Coll.*, 57 f.3d 369, 378 (4th Cir. 1995)). Stated differently, she must offer "proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Guessous v.*

*Fairview Prop. Investments, LLC*, No. 15-1055, 2016 WL 3615780, at *6 (4th Cir. July 6, 2016)

(quoting *Univ. of Texas Sw. Med. Ctr. v. Nassar*, --- U.S. ----, 133 S. Ct. 2517, 2523 (2013)).

The question is, if the College were not responding to Jones's exercise of her FMLA rights as

alleged, would it have decided not to renew her contract anyhow?

The answer is "maybe," because a genuine dispute exists regarding the material facts.

The student evaluations that the College received, discussed above, were overwhelmingly

unfavorable.  While Jones testified that there were other evaluations, including positive ones, in

addition to those Scotland identified, Jones Dep. 149, Jt. Ex. 73, she did not produce any, and she

cannot prove the contents of those evaluations by describing their content without demonstrating

that no originals or duplicate copies are available.  Fed. R. Evid. 1004(a).  She testified that one

student said of her, "'I am beyond grateful that I have an instructor who truly pushes her students

academically,'" and that "'[s]he is a great instructor to have.'"  Jones Dep. 175–76, Jt. Ex. 80.

Jones also testified that another professor who taught the same course had "pretty much the same

amount of students withdrawing" and "the students that respond about him [on

RateMyProfessor.com] are comparable, and some of them are even worse."  Jones Dep. 142, Jt.

Ex. 72.  However, Jones does not provide any direct evidence of the other professor's withdrawal

rates or student feedback.  Her own self-serving testimony amounts to only a scintilla of

evidence in her favor, and is not enough on its own to defeat summary judgment.  *See Cunney v.*

*Patrick Commc'ns, LLC*, No. JKB-13-2519, 2016 WL 3227994, at *12 (D. Md. June 13, 2016)

("Without further evidence, self-serving testimony is insufficient to defeat summary judgment."

(quoting *Williams v. Lazer Spot, Inc.*, No. BPG-13-1850, 2014 WL 5365581, at *3 (D. Md. Oct.

21, 2014))).  And, Jones's unsubstantiated testimony that her contract was not renewed because

"Barbara Scotland had personal issues with [her]," Jones Dep. 134–36, Jt. Ex. 70, is "insufficient

to counter [the College's] substantial evidence of legitimate nondiscriminatory reasons for [not renewing her contract]." *Williams*, 871 F.2d at 459; *see also Cunney*, 2016 WL 3227994, at *12.

Yet, Jones identifies additional evidence from which a reasonable jury could draw an inference of pretext.  Most troubling is Scotland's testimony that she did not know that Jones was on FMLA leave when the termination letter was sent and did not learn that Jones was on FMLA leave until her deposition.  Scotland Dep. 71, Jt. Ex. 152. ("I never know that she was on FMLA leave.  This is the first time finding out.").  This was manifestly untrue, because in a January 24, 2014 email to Jones, Scotland referred to the fact that Jones was "already using leave under FMLA for two courses."  Scotland email to Jones, Jt. Ex. 166.  This untrue testimony undermines Scotland's credibility, and it is Scotland's testimony on which the College relies to establish its legitimate non-retaliatory reason for not renewing Jones's contract.  And, Scotland relied in part on two professor evaluations, one early and one late in her employment, to demonstrate that there were concerns with Jones's performance, but the evaluations reflected an at least "satisfactory" performance.  Scotland Dep. 33, 35, Jt. Ex. 142, 143.  Additionally, Jones testified that Scotland sent an email "to the entire department," complaining about Jones bringing her baby to meetings, after Scotland had told Jones that "it wasn't a problem," Jones Dep. 159–63, Jt. Ex. 76–77.  Scotland's behavior, as Jones's supervisor and in her deposition, "support[s] an inference that [the employer] did not act for its stated reasons," and thereby shows pretext. *See Hanning v. St. Joseph's Ministries, Inc.*, No. WDQ-14-3364, 2015 WL 9304538, at *7 (D. Md. Dec. 21, 2015) (quoting *Nelson v. DeVry, Inc.,* No. 07-4436, 2009 WL 1213640, at *9 (E.D. Pa. Apr. 23, 2009)).

Moreover, to the extent that a jury finds that Scotland's testimony is credible, she testified that the concerns leading to Jones's non-renewal included the fact that "when [the

College] tried to rework [Jones's] schedule" to include her contractually-required course load, the College "could not accommodate" her scheduling requests, as Jones "wanted to only work a certain number of days a week," to "[l]imit[] her time on campus to two days a week, if she could," and to work "very specific times on those days."  Scotland Dep. 66–68, Jt. Ex. 151. While, at first blush, it appears legitimate for the College not to renew the contract of a professor who was not available to teach the necessary number of course in the available time slots, Jones's most recent request for a specific teaching schedule and limited time on campus came in the form of an FMLA request.  Thus, viewed in the light most favorable to Jones, the College did not renew her contract at least in part because of her FMLA request.  Considering this admission along with the evidence of pretext Jones identified, a reasonable jury could find that the stated reasons for not renewing Jones's contract were false and that the College's real reason for non-renewal was retaliatory animus.  Accordingly, I cannot grant summary judgment in the College's favor on this record.  *See Guessous*, 2016 WL 3615780, at *6; *Foster*, 787 F.3d at 252.

## Conclusion

Defendant's Motion for Summary Judgment IS GRANTED IN PART AND DENIED IN PART.  I will enter judgment in the College's favor on Count I but deny the motion as to Count II.  I will schedule a call to set a trial date in this case.  A separate order shall issue.


Dated: September 23, 2016                              _____/S/_____
                                                       Paul W. Grimm
                                                       United States District Judge


lyb